UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                              Plaintiff

v.                                              Criminal Action No. 3:19-cr-223-RGJ

GJERVONTEZ COLEMAN                                                   Defendant

* * * * *

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Gjervontez Coleman's Motion to Suppress Evidence.  [DE 12].  The Court held an evidentiary hearing.  [DE 20].  This matter is ripe.  [DE 14; DE 22; DE 25].  For the reasons below, the Court **DENIES** the Motion to Suppress.  [DE 12].

## I.      BACKGROUND

On the evening of July 15, 2019, Officer Clayton Poff was patrolling the Victory Park neighborhood[1] of Louisville, Kentucky when he "overhear[d] on [his police] radio a call . . . regarding a red Pontiac."  [DE 20 at 60].  From the call, Officer Poff learned that two African-American men in a red Pontiac were involved in an attempted shooting in the Victory Park neighborhood.  [*Id.* at 76; Exhibit 1, 00:00-00:20].  Poff further learned that the passenger, who was wearing a mask, "tr[ied] to shoot a gun, but it jammed."  *Id.*

Within minutes of the call,  Officer Poff saw a red Pontiac.  *Id.* at 82.  After following it for several blocks, Poff stopped the car "solely on the fact that it's a red Pontiac . . . and [n]ot for any driving issues."  *Id.* at 79.  The car pulled into the parking lot of an apartment complex.  *Id.* at 66.  Because the car's windows were "extremely tinted," Officer Poff was unable to "ID any of

---

[1] Officer Poff described the Victory Park neighborhood as a "very high crime area."  [DE 20 at 59].  Based on his experience patrolling the neighborhood, he testified that "it's very common that we have shootings there, also very common that we have homicides in that area.  We also get a lot of robberies, wanton endangerment, thefts, burglaries."  *Id.*

1

the individuals in the car" until he walked up to the driver's side window.  *Id.* at 70;  *Id.* at 79. Officer Poff leaned next to the driver's side window and looked inside.  [Garcia Body Camera, 00:00-00:25][2].  Inside the car, Officer Poff saw five African-Americans: a female driver, a male front-seat passenger, and Coleman and two women in the backseat.  *Id.*;  [DE 20 at 81].

Once "enough officers"[3] were on scene, Officer Poff asked the occupants to exit the vehicle because he "wanted to continue the investigation" and he thought "it would be safer and easier way to go ahead and get them out of the vehicle so [he] could talk to them separately to try to figure out if this was the vehicle that was used in the crime at Victory Park."  [DE 20 at 68].  By this time, a crowd of people had gathered in the parking lot.  [Garcia Body Camera, 03:30-03:50].

The front-seat passenger, who had a blue bandana in his front waistband, exited the car first.  *Id.* at 00:40-00:55.  Officer Garcia patted him down and he was unarmed.  *Id.*  As Coleman "hestitant[ly]"[4] exited the car, Officer Davis "noticed a bulge" in his waistband.   [DE 20 at 94]. When Officer Davis patted him down, the "bulge" in Coleman's waistband "felt like a handgun or a handle of a handgun."  *Id.* at 95.  Officer Davis placed Coleman's "hands behind his back, detained him by placing him in handcuffs.  And once [Davis] lifted up his shirt, the gun actually fell through [Coleman's] pants."   *Id.*  After the officers arrested and Mirandized Coleman, he admitted that the gun was his and that he had it for a week.  *Id.* at 73.

---

[2] During the suppression hearing, the United States admitted video clips from the officers' body camera footage.  However, before the suppression hearing, the United States provided the Court with the complete body camera footage from that night.  The Court has reviewed the complete body camera footage and cites to it throughout this Opinion.

[3] More than five officers responded to the scene.  [Luckett Body Camera, 02:05-02:10].

[4] Although Coleman was seated directly behind the driver's seat, it took him about fifteen seconds to get out of the car.  *Id.* 02:15-02:30.

## II.    DISCUSSION

Coleman moves to suppress evidence obtained after he was stopped by the police, arguing that, even if the officers had reasonable suspicion to stop his vehicle, they did not have reasonable suspicion to further detain him after they determined that he and the other occupants of the vehicle did not match the dispatcher's description of the suspects.  [DE 12 at 35-36]. Coleman also moves to suppress his statements as fruit of the poisonous tree of the illegal stop and search.  *Id.*

### A.    The Officers Did Not Violate Coleman's Fourth Amendment Rights[5]

### 1.    The officers had reasonable suspicion to stop the red Pontiac

"The police are permitted 'to stop a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Slater*, 209 F. App'x 489, 495 (6th Cir. 2006)  (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)).  Reasonable suspicion cannot be based on "inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences which [a police officer] is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).   In evaluating whether an officer had reasonable suspicion, courts look at the "totality of the circumstances" and consider "all of the information available to law enforcement officials at the time." *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008)  (internal quotation marks and citation omitted).

A few minutes after the dispatch call, Officer Poff saw a red Pontiac pass him in the same high-crime neighborhood where the attempted shooting allegedly occurred.  [DE 20 at 61].  The descriptor—"red Pontiac"—was particular enough to justify a stop based on a reasonable inference that its occupants were the same individuals who were involved in the attempted shooting in that

---

[5] Because the officers did not violate his Fourth Amendment rights, his statements to the police, which were made after he was Mirandized, will not be suppressed as fruit of the poisonous tree.

3

same neighborhood just minutes before. *See United States v. McCauley*, 548 F.3d 440, 444-46 (6th Cir. 2008) (finding a description of "an armed black male driving a small black SUV" was sufficiently particularized and holding that the officer's stop of a car matching that description in an area close to the car's last known location was supported by reasonable suspicion); *United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007) (finding a description of the suspect's vehicle as a "small black Nissan" sufficiently particular and holding that reasonable suspicion existed where, a minute after dispatch relayed that suspect in a drive-by shooting would be driving a "small, black Nissan," police stopped a car matching that description near the reported scene); *United States v. Long*, 464 F.3d 569, 571-575 (6th Cir. 2006) (holding unidentified citizen's report that three men in a black and gray Ford Ranger pickup truck were robbing his neighbor's house supported stop of a Ford Ranger matching the description driving away from the area where the call had originated); *United States v. Hurst,* 228 F.3d 751, 757 (6th Cir. 2000) (holding stop of a dark-blue Mercury Cougar containing three passengers was reasonable based on reports of a dark-colored, two-seat Ford Thunderbird fleeing the scene of a burglary). For these reasons, the Court finds that the officers had reasonable, articulable suspicion to stop the red Pontiac.

2. The officers did not exceed the permissible scope of the investigate stop

Because the initial stop was permissible, the Court next examines "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). While "there is no rigid time limitation on the lawfulness of a *Terry* stop," the court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it

4

was necessary to detain the defendant." *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (internal quotation marks omitted).

The United States argues that "the record reflects that the officers diligently pursued the least intrusive means of investigation. Each occupant was asked to step from the vehicle. Only the males were checked for weapons, since the radio call stated that a male had brandished the firearm. Coleman was the last person patted down, resulting in the discovery of the firearm. The discovery of the firearm occurred approximately three minutes after the red Pontiac parked." [DE 22 at 123]. Coleman, on the other hand, argues that it was unreasonable for Poff to detain him after the stop: "Upon approaching the red Pontiac, Officer Poff very quickly realized that this was not the vehicle involved moments earlier in an attempted shooting. How do we know this to be true? Because everything that Officer Poff (and the other LMPD officers involved) said and did demonstrate it to be true." [DE 25 at 135-136].

The Court finds that the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Orsolini*, 300 F.3d at 730. Upon approaching the red Pontiac, Officer Poff determined that there were five people in it, not two as reported by dispatch. He also discovered that an African-American woman, not an African-American man, was the driver. But these discrepancies do not "defeat the assessment" that the officers "had reasonable grounds to investigate further" because the "discrepancy . . . might reasonably be explained in any number of ways." *Hurst*, 228 F.3d at 757. The red Pontiac's windows were tinted and the attempted shooting occurred near sunset. [Luckett Body Camera, 00:34-00:36]. Dark windows and diminished daylight can reasonably explain why the initial caller to dispatch did not see the three other people in the vehicle, especially as they were found in the backseat. It likewise reasonably

5

explains why the caller may have misidentified the driver as a man.  Despite these discrepancies, the officers had a right to detain the occupants of the red Pontiac after the stop.  *See United States v. Jackson*, 188 F. App'x 403, 415 (6th Cir. 2006)  ("Minor mistakes, such as the description of a suspect vehicle, its direction of travel, or a suspect's clothing, do not automatically vitiate an officer's finding of reasonable suspicion").  Officer Poff testified that he wanted to speak with the occupants of the vehicle "separately to try to figure out if this was the vehicle that was used in the crime at Victory Park."  [DE 20 at 68].  Because Coleman could not be excluded as a suspect in the shooting, it was necessary to detain him so they could ask him questions.  *See United States v. Evans*, 947 F. Supp. 2d 895, 898 (E.D. Tenn. 2013)  (citing *United States v. Martin,* 289 F.3d 392, 396 (6th Cir.2002))  ("The officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions").  The officers reasonably extended the stop by a few minutes to remove Coleman from the vehicle to ask him questions about that night.[6]  *See Michigan v. Summers,* 452 U.S. 692, 700 n. 12 (1981)  ("If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*");  *See also United States v. Thomas*, 11 F.3d 620, 627 (6th Cir. 1993)  (quoting *Hensley*, 469 U.S. at 229  ("Where the police seek to locate a person suspected of involvement in a past crime, 'the ability to briefly stop that

---

[6]  Once they recovered the firearm, the officers' focus appears to have shifted from the attempted shooting to determining whether Coleman and the front-seat passenger were felons.  [Luckett 12:00-13:50].  In the end, the officers charged Coleman with being a felon in possession of a firearm, but they neither questioned him about the attempted robbery nor charged him with it.  That said, "whether a detained suspect is later determined not to have violated the law does not bear on whether the detaining officer had a reasonable suspicion to justify detention while pursuing an investigation."  *See Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 624 (E.D. Mich. 2016)  (internal quotation marks and citation omitted).

person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice'").

Coleman sees things differently: "Officer Poff very quickly realized that this was not the vehicle involved moments earlier in an attempted shooting." [DE 25 at 136]. Coleman asserts that "Officer Poff and the other officers did not approach the vehicle with guns drawn, did not immediately pull the two men out of the car," and "did not have them lay down on the ground with their hands behind their heads." [DE 25 at 136]. From these facts, Coleman infers that "[i]f Officer Poff believed that the individuals in the red Pontiac were those who were involved in an attempted shooting just moments ago, all of those actions would have occurred." *Id.* But, Coleman's inferences about Officer Poff's subjective beliefs are rebutted by the officers' testimony. Indeed, Officer Poff denied that he ever affirmatively determined that "these individuals were not the individuals who were involved in the initial run."

> Q. Fair to say that pretty quickly into this stop it was determined that these individuals were not the individuals who were involved in the initial run?
> A. The females or the males?
> Q. The car as a whole.
> A. I don't know if I was ever able to determine that, sir.

[DE 20 at 89].

He also explained that he "wanted to continue the investigation" by speaking with the occupants of the red Pontiac: "I wanted to continue the investigation. I thought it would be a safer and easier way to go ahead and get them out of the vehicle so I could talk to them separately to try to figure out if this was the vehicle that was used in the crime at Victory Park." *Id.* at 68. Finally, Davis' testimony reveals that, contrary to Coleman's assertions, the officers viewed the occupants of the red Pontiac as a potential threat:

> A. I was about third or fourth car on the scene—
> Q. Okay.

A.   —and I was on the rear driver's side of the vehicle.
Q.   Okay. Is it unusual with a call like this for several officers to go—to respond whether they're called to go or not?
A.   No, it's not unusual.
Q.   Why is that?
A.   Because what the description—saying there's a gun involved, we like to have as many officers there as we can just for safety purposes.

[DE 20 at 93].

That said, even if Coleman's inferences are valid, they are not persuasive because the officers' subjective beliefs are irrelevant to the Court's reasonable suspicion analysis. *See United States v. Pacheco*, 841 F.3d 384, 394 (6th Cir. 2016) (quoting *Terry*, 392 U.S. at 21–22) ("Reasonable suspicion requires reviewing courts to apply an objective standard, and to answer whether 'the facts available to the officer at the moment of the seizure or the search warrant a [person] of reasonable caution in the belief that the action taken was appropriate?'"); *United States v. Winters*, 782 F.3d 289, 303 (6th Cir. 2015) (Reasonable suspicion is "judged by an objective standard that does not depend on the subjective beliefs of the officer on the scene"); *United States v. Wagner,* 193 Fed. App'x 463, 466 (6th Cir.2006) ( "The test for reasonable suspicion is not whether the detaining officer subjectively believes that the circumstances create a reasonable suspicion, but whether there is a particularized and objective basis for suspecting legal wrongdoing") (internal quotation marks and citation omitted); *United States v. Herbin,* 343 F.3d 807, 810 (6th Cir. 2003) ("[C]ontinuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation. From beginning to end, the constitutionality of a traffic stop under the Fourth Amendment depends on the objectively reasonable justifications for the officers' actions, not their subjective intentions"). For these reasons, the Court finds that the officers "diligently pursued a means of investigation that was

8

likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Orsolini*, 300 F.3d at 730.

3.     The officers had reasonable suspicion to pat-down Coleman

An officer may "perform a 'patdown' of a driver and any passengers [only] upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)  (citing *Terry,* 392 U.S. 1).  "Reasonable suspicion is based on the totality of the circumstances," *Joshua v. DeWitt,* 341 F.3d 430, 443 (6th Cir.2003), and it exists if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger," *Terry,* 392 U.S. at 27.  The police must have "a particularized and objective basis for suspecting [that] the particular person" to be frisked is armed and dangerous. *United States v. Cortez,* 449 U.S. 411, 417 (1981).

Coleman argues that the officers did not have reasonable suspicion to believe he was armed.  [DE 25 at 134-135 ("When LMPD officers required Mr. Coleman to exit the red Pontiac, did they have any reasonable articulable suspicion to believe that he was armed and dangerous, or that he was involved in the prior incident involving pointing a handgun at an individual? . . . In this case  . . . the officers demonstrated through both their words and actions that they did not possess a reasonable suspicion").  The United States, on the other hand, argues that they did: "Once the vehicle was stopped, the officers were justified in asking the occupants to step out of the red Pontiac for their safety as the officers had conducted a traffic stop based upon information that an occupant in the Pontiac had brandished a firearm. The red Pontiac was seen a very short time after the call was received identifying a red Pontiac as containing an individual brandishing a firearm." [DE 14 at 43].

The officers had reasonable suspicion to believe Coleman was armed.  The officers learned from dispatch that an African-American male in the front-passenger seat of a red Pontiac was armed, wearing a mask, and tried to shoot someone.  [DE 20 at 76].  They also received information that an African-American male was driving the car.  *Id.*  After the officers stopped the red Pontiac, they found an African-American male in the front-passenger seat.  *Id.* at 81.  After speaking with the driver for a few minutes, the officers asked the passengers, including Coleman, to step out of the car.  [*Id.* at 00:00-02:30]; *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997)  ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop").  When Coleman exited the car and before they patted him down, officers saw a "distinct bulge in his waistband."[7]  [DE 20 at 68].  The bulge in Coleman's pants, standing alone, may have been enough to frisk him.  *See United States v. Hardeman*, No. 19-20283, 2019 WL 5597141, at *1 (E.D. Mich. Oct. 30, 2019)  ("Observing a bulge is sufficient to satisfy reasonable suspicion that Hardeman was armed"); *United States v. Stennis*, 457 F. App'x 494, 499 (6th Cir. 2012)  ("The officer's perception of a bulge suspected to be a weapon provides reasonable suspicion that the individual may be armed and dangerous").

But, the officers here had even more.  The front-seat passenger was an African-American male who had a bandana (which could easily double as a mask) readily accessible in his waistband. [*See* DE 20 at 98 ("Q. Do people ever use, in your experience, bandannas as a mask? A. Yes, sir"].

---

[7] On cross-examination, Poff admitted that he failed to include this detail in his police report.  [DE 20 at 88].  While Poff perhaps should have included this information, his failure to do so does not, by itself, compel the Court to discount his credible testimony about the "bulge" in Coleman's waistband.  Moreover, Officer Davis, the officer who patted down Coleman, corroborated Poff's testimony: "And once he started to stand up, I noticed a bulge and so we turned him away, put his hands on the car. That's where Officer Poff also picked up on it. And then once we noticed the bulge, I went and patted over it and it was—it felt like a handgun or a handle of a handgun."  *Id.* at 94-95.  Finally, body-camera footage from that night shows Coleman wearing tightly fitted clothing, which also supports the officers' testimony that they could see a "bulge" under it.  [Luckett Body Camera, 06:03-06:05; Poff Body Camera, 18:00-18:40].

Because he could have been the shooter—or, at least, could not be disqualified as it—it is reasonable to infer that Coleman, the only other man in the car, could have been his accomplice. *See Cortez*, 449 U.S. at 418 ("The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers").

*United States v. Bell*, 762 F.2d 495, 500 (6th Cir. 1985) is on point.  There, Earl Cherry was the target of the officers' investigation.  *Id.* at 496.  When the officers arrested Cherry, they found Bell in the passenger seat of Cherry's van.  *Id.* at 497. After the officers arrested Cherry, they patted Bell down and recovered a gun from his coat.  *Id.* The district court suppressed the gun.  *Id.* at 498. Reversing the district court, the Sixth Circuit held that the officers were justified in patting down Bell for five reasons: "(1) Cherry was known to be potentially armed and dangerous; (2) Bell was in the Cadillac with Cherry; (3) Bell could not be ruled out as Cherry's accomplice of the week before; (4) the car was parked in a relatively crowded place, with people milling around it; and (5) Bell refused to comply with the agent's commands while staring at him "defiantly.'" *Id.* at 502.  Here, like in *Bell*, the officers were justified in patting down Coleman because: 1) the front-seat passenger was "potentially armed and dangerous"; 2) Coleman was in the red Pontiac with him; 3) Coleman could not be ruled out as his accomplice in the attempted shooting minutes before they were stopped;  and 4) a group of people had gathered in the parking lot where the red Pontiac was stopped.

Unlike Bell, however, Coleman was not "defiant," so that reason for the pat-down does not apply here.  But in lieu of that one reason, the officers here had four additional reasons to pat-down Coleman.  First, Davis described Coleman as being "hesitant" to exit the vehicle.  [DE 20 at 94].

11

In fact, it took Coleman about fifteen seconds to exit.  [Luckett Body Camera, 02:15-02:30].

Coleman's reluctance to exit the vehicle could reasonably lead an officer to believe that he was

armed and dangerous.  *See United States v. Jackson*, No. 16-CR-2059-LTS, 2017 WL 9440791, at

*6 (N.D. Iowa Mar. 6, 2017), *report and recommendation adopted as modified*, No. CR16-2059-

LTS, 2017 WL 1404325 (N.D. Iowa Apr. 19, 2017) ("Defendant's hesitation and resistance to

getting out of his car adds to the totality of the circumstances that would lead a reasonable officer

to suspect defendant may be armed and dangerous").  Second, as mentioned above, Coleman had

a bulge in his waistband.  [DE 20 at 68].  Third, the officers were investigating an attempted

shooting, a violent crime involving a gun.  *Id.* at 66; *See United States v. Bullock*, 510 F.3d 342,

346 (D.C. Cir. 2007) (collecting cases)  ("If an officer possesses reasonable suspicion that the

detained suspect committed a violent or serious crime—such as murder, robbery, rape, burglary,

assault with a weapon, or various drug offenses—the officer by definition is dealing with an

individual reasonably suspected of committing a crime that involves or is associated with carrying

or using a weapon").  According to the officers' testimony, dispatch reported that the front-seat

passenger was armed, but was silent on whether anyone else in the car was as well.[8]  *Id.* at 76.

Fourth, the officers were investigating a crime in a high-crime neighborhood.  *Id.* at 59.  *See United*

*States v. Smith*, 594 F.3d 530, 541 (6th Cir. 2010) ("It was reasonable to conclude, based on [the

officer's] prior testimony regarding his extensive experience in this area ... that this was a high-

crime area."); *United States v. Bridges*, 626 Fed. App'x 620, 623 (6th Cir. 2015) ("[The officer's]

testimony that the area was 'known' for a 'high' level of criminal activity was sufficient to support

the district court's finding that the location of arrest was a high crime area."); *United States v.*

---

[8] Coleman acknowledges the possibility that there was another gun in the car: "The car isn't searched. So once you have the occupants out of the car, the front passenger's supposed to have had the gun. Obviously there's nothing in the dispatch that precludes there being more than one weapon."  [DE 20 at 104].

*Pacheco*, No. 16-3376, 2016 WL 6311621, at *6 (6th Cir. Oct. 28, 2016) (noting that testimony from an officer stating that an "area was known for its drug trafficking and gun violence" supported that the area was a high crime area).

A reasonably prudent person, when confronted with these circumstances, would consider the front-seat passenger and Coleman—the only other man in the red Pontiac—to be armed and dangerous.  Officer Davis' frisk of Coleman was not the "product of a volatile or inventive imagination, or was undertaken simply as an act of harassment."  Instead, it was "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so."  *Terry*, 392 U.S. at 28.  As a result, it was reasonable for Officer Davis to pat down Coleman as he exited the car. *See id.* at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"); *See also United States v. Snow*, 656 F.3d 498, 503 (7th Cir. 2011)  ("Because the facts known to the officers supported a *Terry* stop to investigate whether he in fact had attempted a residential burglary, and because burglary is the type of offense that likely involves a weapon, Andrews' decision to order Snow out of the truck for purposes of a protective frisk was reasonable despite the absence of additional facts suggesting that Snow in particular might be armed").

### III.   CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED that** Coleman's Motion to Suppress Evidence [DE 12] is **DENIED** as set forth above.  This matter is set for an in-person status conference on **November 16, 2020 at 1:00 p.m.**

at the Gene Snyder United States Courthouse before the Honorable Rebecca Grady Jennings, United States District Judge.

Rebecca Grady Jennings, District Judge
United States District Court

October 22, 2020

Cc:     Counsel of record